090651 Charlotte Elizabeth Carcharo v. DiFilippo Debra Thomas on behalf of the plaintiffs, my co-counsel is Harry Lee. We request 15 minutes for oral argument and five minutes reserved for rebuttal. Good morning, Justice. This is John Lang Henry for Defendant Dr. Mary DiFilippo, along with co-counsel Melissa Gordon. I would need approximately 15 minutes or less. Thank you. Proceed, counsel. May it please the Court. Your Honors, this is a medical negligence case involving Could you speak up a little bit? I'm a little bit impaired. involving a loss of chance on proximate cause theory. This case was tried over eight days and the jury deliberated over two days before reaching their verdict. This was a classic battle of the experts, and as in any medical negligence case, the credibility of plaintiffs' experts was paramount. We will first, I will address primarily issue number one, the Bakken reprimand. Issue number four, the cross-examination of Dr. MacArthur on withdrawn opinions in the case. And issue number three, Dr. Andreoni, an independent witness, and the raising of the attorney-client privilege. With regard to Dr. Bakken's reprimand, at the onset of trial, the defense had entered by the Court a motion in limiting number three, preventing the introduction of any other litigation or negligence matters affecting the experts. And this was entered reciprocally. During Dr. Bakken's direct examination, during a luncheon break, defendant informed the Court that it wished to raise the issue of a reprimand issued by the Illinois Department of Professional Regulation against Dr. Bakken for his failing to learn that a patient of his had a urinalysis test showing blood in the urine. Defendant maintained that this was relevant to challenge the credibility of Dr. Bakken's opinions in this case. We argued nearly an hour on this matter before the Court, and the Court ultimately ruled that it would be admissible. In so doing, the Court committed two reversible errors. First, the Court found that it had no discretion to keep out the reprimand if it was closely linked to the opinions of Dr. Bakken. In so believing and finding, the Court disregarded the teachings of Creighton, where this Court emphasized that disciplinary actions and their outcomes are not admissible. What is admissible are restrictions on practice. In this case, Dr. Bakken had given some testimony on direct already and indicated he was serving as an epidemiologist of his hospital. He had a full practice, which was not restricted. We urged the Court to voidare Dr. Bakken to assure itself that he had no restrictions on his practice. Excuse me, counsel. Where is it in Creighton, the specific distinguishing factor that you're saying about it's only the holding is restricted only to the limitations of the practice? Where is it there that you're saying it doesn't include what the judge said it did? The Court, in approving the trial court's actions below, specifically the Creighton court specifically stated, are you asking me for a cite, Your Honor? Well, I've got the case in front of me. I'm saying where is the specific language on it? I don't see that specific language of that limitation. I agree it is not crafted as a strict limitation. And I believe we stated in our briefs that there is no case directly on point saying under no circumstances will a bare reprimand ever be allowed into evidence unless there is a restriction on practice. But however, what the Creighton opinion teaches is approval of the circuit court carefully crafting, and I'm at 69. Okay. Carefully crafted its rulings so the jury would be informed of only two of the current restrictions on Dr. Oppenheim's medical license. That the agency could conduct announced and unannounced inspections of his practice and that a physician proctor was to review periodically his patient records, but not his criminal convictions or his history of disciplinary actions. And then on the following page of the opinion, in distinguishing a pool, the court went on to say, unlike the jury in pool, the jury here never was informed of disciplinary action taken against Dr. Oppenheim. Pool, therefore, is an opposite. Bringing in other, first of all, this was in violation of the motion in limine, or there was a motion in limine already entered. But the trial court ruled against the plaintiff's position. Well, it allowed the motion in limine initially. A defendant then came in midstream in trial and said, well, we know we have this in limine order, but we would like to bring in this evidence that Dr. Bakken was found negligent by an administrative body. And that was during the break in his direct testimony at the luncheon hour. And that's your position based on the, most of your case relied on the particular doc that you were prejudiced by this? Manifest prejudice, Your Honor. Absolutely. But the standard is abuse of discretion, isn't it? For allowing the evidence? Yes. No, Your Honor, because what we claim is that the court did not apply any discretion. It mistakenly believed that it had no choice but to allow it if it met a certain test. And that test is, was there a clear link under O'Brien between the basis for the reprimand and Dr. Bakken's opinions in this case? So even if this Court were to disagree with our position on the first issue, we submit that the Court erred in the second issue. The Court, again, refused to avoid error, Dr. Bakken, to determine and apprise itself of facts on which to base a ruling. Our position is the manifest weight of the evidence would govern this issue because the Court had a duty to explore the facts underlying the reprimand and to make certain it knew what his opinions were in this case before finding a close link. I think it was error to find a close link between a reprimand, which had no effect on his practice, for not learning of a result of a urinalysis test, where Dr. Bakken in this case, and we never raised as one of our causes of action or issues of failure to diagnose or an incorrect diagnosis. This was not a wrong diagnosis case. Am I missing something here? I thought, sure, that Dr. Bakken specifically criticized Dr. Filippo for an improper diagnosis. We're missing it. No. It is nowhere in the record, Your Honor. It was not one of our issues, and he never criticized a diagnosis. There were two Dr. Bakken did not give an opinion that Dr. DeFilippo violated the standard of care by failing to diagnose the systematic infection. Necrotizing fasciitis? Yeah. No, absolutely not. No, failure to diagnose the systematic infection. No, at that point in time, he did not. He agreed. At what point in time? During his testimony? No, when the defendant made her differential diagnosis at 2 a.m. on the morning of November 5th. Uh-huh. Okay? Her differential diagnosis was heart attack versus sepsis. Uh-huh. Dr. Bakken absolutely agreed that Mr. Sotero had sepsis, a systemic infection, as of 2 a.m. What he criticized was her failure to take action because he was a very sick man. She kept him on Keflex, a very mild antibiotic. It was his opinion that she failed to treat him in the absence of a firm diagnosis, treating empirically. She should have placed him on IV antibiotics, broad spectrum, not only because his infection was spreading, which was a matter of record that she knew about. It had spread from 8 o'clock in the morning on November 4th from a 2-inch diameter to cover half his abdomen. But it's still not, all that evidence doesn't go to a failure to diagnose. It's not a failure to diagnose, Your Honor. That's our position. It was a failure to treat what she knew was going on, what she suspected was going on, and to treat empirically. And even if, even if this could be construed as a failure to diagnose, it had nothing to do with diagnosing blood in the urine. We're talking about a postoperative. Oh, excuse me, counsel. Are you saying the fact that the, that what the doctor, Dr. Bakken, was reprimanded for, that scenario had nothing to do with what he was testifying to, that that's the connection? Absolutely. As opposed to failure to diagnose being the issue on both of them, and he's now speaking and testifying about someone else who may have failed to diagnose properly. I mean, that's what you're saying. No matter how you put it, he was testifying as failure to diagnose. That was the trial judge's position, that in both cases there was a failure to diagnose. Our position is neither really involved a diagnosis. But even if you, if you use that language and say, yes, there was a failure to diagnose, the severity of Mr. Cetera's infection, and Dr. Bakken missed a lab result and failed to find that one of his patients had blood in his urine, as shown on a urinalysis, the underlying issues were not the same. And that's the point of O'Brien. There has to be a close link between the evidence that's being offered to challenge the credibility and the issues in the case. Perhaps the trial judge's own comment sums it up best. She said, this is nonsensical in terms of what a jury will make of it, but I don't believe I can keep it out. I suggested O'Brien, having cited O'Brien myself and be reversed for doing so in a case involving Justice Coleman, stands to the proposition that when a doctor fails to pass a licensing exam to be board certified, that is not something that can generally be brought up. I held the other way just about four years ago, and I got spanked for it immediately by the Supreme Court, showing that Justice Coleman was correct, and I was wrong. As well you should have. Clearly I was wrong. Why bring it up? And so I think O'Brien is much more limited than you suggest. And again, that's not your fault. It's not that you're trying to mislead us. There are no cases in this area, so you look at what's close. And certainly I'd suggest that while you're suggesting that the other cases we're talking about, we're not close at all. I think they're, I mean, Creighton is not on point. You'd rather have O'Brien or Poole. There's not a lot out there. This will be out there in your argument. Well, we should go say that in this area it has to be something connected to it. Exactly. That's prong two of our argument. There has to be a close connection between what the case is about and what the impeaching evidence is about. And tellingly, it was never used. It was just thrown out there in front of the jury, as the judge said, nonsensical. Were you recommended by the state? I would ask you not to focus too strongly on Judge McCarthy's use of that word. She used that word in a lot of contexts. So this Court is not going to take too much stock in her commentary there. Proceed. Your Honor, the error was, this error was compounded. When we asked, we objected and asked for a sidebar. And the trial court stated in the presence of the jury, no, you've had 45 minutes on this. We are going home in an hour and four minutes. Therefore, the jurors heard not only that our expert, our only expert, who gave opinions on the assessment performed by the defendant, not only that he was, his credibility was challenged, but that we had spent 45 minutes trying to keep it out, and that the pace of the trial was much more important than resolving this issue. Well, I thought that came up in the idea that, Frankie, you weren't able to make your record so we wouldn't forfeit the issue. And you haven't forfeited the issue. We're going to rule on the issue, counsel. So I think that's where she was going, Judge McCarthy, being kind of cranky and saying, I've heard enough of this. Move on. You haven't forfeited it. She told you not to bring it up. So we'll let you ask. Thank you, Your Honor. May I cover the MacArthur point? Sure. If there are no other questions. Our second expert was Dr. Roger MacArthur. We went through his opinions after we settled with Christ Hospital. He had opinions that there were some nursing doses, and if those doses had been given, it also could have provided a chance for a better outcome to Mr. Cetera. This was after the dependent had her opportunity to treat and provide a better outcome for Mr. Cetera. Had we not settled with Christ Hospital, all of these opinions would have come in from Dr. MacArthur. Because we settled, they were no longer relevant. The point is, the testimony about missed doses and causation did not in any way impair the credibility of his opinion as to the defendant. We briefed this in a motion and lemonade to keep this out. The court indicated if we kept our direct exam as tightly as we proposed, she saw no reason why it should be allowed in. However, during the cross-examination, defendant did in fact examine Dr. MacArthur on missed doses and causation. We objected. We asked for a sidebar. Our objection was overruled. We were told sure at lunch, and the testimony was allowed to be elicited. We needed a sidebar then and there to reinforce what had been argued on our motion and lemonade. It was error not to grant that motion and lemonade, and it was error not to give us a sidebar. It was error to allow this evidence of nursing errors and proximate cause and put it forth to the jury as a confusing issue. That number one, Dr. MacArthur had withheld opinions on direct examination and that we were prevaricating by withholding those opinions about other mischief going on in the case. And number two, it created a false causation issue, that even if Dr. DeFilippo, the defendant, did not order the proper antibiotics, when she had a chance to, that somehow that exculpates her because two later doses were missed according to the nursing records. And that is not the law. These would have been, if we tried the case with Christ Hospital, each would have been proximate cause. The jury could well have found that both Dr. DeFilippo and the nurses were negligent because they were no longer in the case. It was not relevant. It was nothing the jury should have been focused on. And giving, on top of that, giving 1204 under these circumstances was highly prejudicial to the plaintiff because it drew the jury's attention to matters other than the proper proofs in this case. The defense cites, of course, Nolan v. Wild McClain, his bestest case. And if you look in that language cited in Nolan, where they talk about Leonardi, which is, of course, the leading case, they discuss, Leonardi underscored that in such cases a defendant has a right to introduce evidence to contest proximate cause and competent evidence about others as causal factors must be allowed to cite. And in footnote 4, they cite Leonardi for the proposition that 1204 is proper where there was some evidence of a non-party's involvement. That's what they wrote a year ago, this week. How, then, are we to say that this is, McCarthy is wrong for allowing 1204 and allowing this clause? Because under Leonardi, there has to be some evidence of sole proximate cause before it becomes relevant. In addition, the defendant cannot attempt to put forth its case by going beyond the scope of direct examination and cross-examining an expert of the plaintiff. Have I answered your question, Your Honor? As far as 1204, it's our position it was highly prejudicial, especially where two sole proximate cause instructions were given. The instructions were imbalanced. The jury was totally focused on defendant's theories of proximate cause in this case. We should have been given our loss-of-chance instruction. And, Your Honor, sometimes I get it, sometimes I don't in the courts below. I'm happy when I get it. Almost ten years ago, this court upheld one of our, Harry Lee's and mine, loss-of-chance instructions in a wrongful death case. Unfortunately, it was a Rule 23 opinion. But it would be very helpful to have some guidance on that so some courts don't feel that 1501 always, in any case, satisfies instructing the jury. There are times, such as in a loss-of-chance case, when that theory of proximate cause must be amplified and clarified for the jury. I submit that when you have, as in this case, two sole proximate cause instructions going to the jury and focusing the jury on defendant's theories, at a minimum we should be entitled to not only argue but have the force of an instruction behind us when we argue and define what it means to say loss-of-chance under the law. This is highly prejudicial. And there is a Supreme Court case, it's a product liability case, Mikulajic, that deals with the importance of having each party having its theories of the case presented to the jury. And that there are times when the IPI instructions just aren't enough. I submit that in some loss-of-chance cases it's not enough and we need amplification and clarification. And a word from this Court on that issue would, I'm sure, be extremely welcome to the bar. Your Honor, I see I'm out. We'll have time to reply, if that's all right. Are there any questions on that issue? The Andreoni issue, may I speak to it? Briefly. Very briefly. Dr. Andreoni was held out as an independent witness. The attorney-client privilege was raised when I attempted to examine him at his evidence deposition. We immediately raised this with the Court. Dr. Andreoni had followed the advice of both defense counsel who raised it and an appointed counsel. The important thing here is Dr. Andreoni testified when I asked him, did you request counsel? He said, no, I did not seek counsel. Counsel was assigned to me. At this point in time, we had a right to know what was going on, who arranged to have legal representation for this witness who did not request legal representation. The attorney-client privilege is always construed very narrowly. That's how it should be construed. In this case, it was construed broadly. The trial judge made a firm ruling that in no case can we go beyond that. End of story. So any argument of waiver here is wrongly made, because if we couldn't ask the witness the important questions, how he may have become biased or prejudiced or influenced in his testimony, what is the point of doing anything more? And that's why we filed a petition for rule to show cause, trying to come at the issue from another angle, the violation of Rule 206, interfering with the taking of evidence at an evidence deposition. And the rule ---- Excuse me, counsel. I'm sorry. I've got to go back a little bit. Dr. Andreoni, he was a treating physician. He was a treating physician. And this is why it was all the more detrimental to our case. He was held out as an independent treating physician, when in fact he was assigned counsel. And we believe, based on one of the objections by his assigned counsel, attorney-client privilege and the insurance privilege, that it was from an insurer. Yeah. It makes sense. And you rely on Golden v. Kishwa, right? Yes. If you go back to the previous issue, you rely on the idea that in that case Dr. Brandon's expert, Conner, worked actually for the insurance exchange. In this case, there's no question that Andreoni did not work for ISME or anybody else. He worked as his own doctorate or as a hospital. Correct? If you go back to the previous issue in Golden, and the issue there was the Supreme Court's ruling, which barred cross-examination of the defense medical experts as to their discretion, particularly in the absence of any showing of how many mutual members are associated in the exchange or any explanation of how or to what extent individual members would profit in the event of a favorable decision. So in your case, our case, was Andreoni at the – was there evidence presented – let's assume – is it ISME? Is that the theory? That's what we assume, yes. Yes. It's a good assumption, I think. How many members there are in ISME and how much Andreoni was likely to make a – get ahead based on a favorable verdict for his fellow ISME-ite, Dr. de Flavel? That wasn't put on the record, was it? Your Honor, we were not coming at it from that angle. In this case, he showed up with a lawyer. In the case Your Honor just cited, that wasn't the issue where the attorney-to-client privilege was raised. And we want to get to the bottom of who's assigning this independent witness a lawyer, preparing him for his debt, and giving him documents. I mean, we have a right to know that. That's fundamental trial procedure. And the attorney-client privilege we cited in the cases, it should not have blocked those fundamental questions. Then and only then would we get to the bottom of the issue. But how would it be relevant in front of the court, the bottom line, asking for the jury who is to attack Andreoni's credibility? It would be if, if things panned out as we suspected, it would be that the defendant's insurer, who retained the defense counsel, learned of this deposition, retained counsel to prepare an independent witness to give trial testimony. Now, that's what we believe went on. We could never get to get the door open because of the rulings made by the court. So we don't know for a fact. I can't represent to you that that's the solid truth. But we deserve the right to explore it. And that's why, if this case is reversed and remanded, we would ask this Court to give special instructions to the trial court to have a hearing or the reopening of the deposition so that these questions be answered. And we'd be entitled to our opportunity to prove bias in this case. You have a couple minutes for reply. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Good morning again, Justices. My name is John Langhenry, and I represent the defendant, Mary D. Filippo. The plaintiff's first argument was regarding Dr. Bakken, who was the expert, infectious disease expert and internal medicine expert. He gave opinions both on standard of care and proximate cause. There was some discussion from the plaintiff regarding him not giving opinions regarding a diagnosis. At multiple points during his testimony, he gave opinions regarding diagnosis. Most notably, he said that Dr. D. Filippo first called it a mild cellulitis, which he disagreed with. He criticized that based on the location, the redness, the weakness, the low blood pressure, other things other than what Dr. D. Filippo saw as a small pink area near a wound site. He also went on to say that Dr. D. Filippo didn't diagnose or consider other things such as a drug rash or deeper tissue involvement. He said she was, quote, quite sick. He also said she didn't diagnose sepsis versus heart attack. She just left that out there as possibilities. He said that she didn't diagnose a significant soft tissue infection. She called it a mild cellulitis. He was very critical of what she diagnosed there and then her subsequent treatment of the Keflex, which was an antibiotic. He said it was a systemic infection, which he didn't appreciate. He said that she didn't appreciate the severity of the infection. He said that there should have been a differential diagnosis that included necrotizing fasciitis. So at multiple points, he criticized her diagnosis of mild cellulitis versus what he thought was a much more severe problem, which leads to Judge McCarthy's ruling. She said that in both cases, Dr. Bakken's prior case where he was reprimanded, which was a failure to diagnose microhematuria, which is blood in the urine, and in this case, which was a failure to diagnose a severe infection, that that was enough of a nexus for Dr. Bakken to be cross-examined. Now, before Dr. Bakken was cross-examined, the jury heard about his great credentials, that he was an infectious disease specialist, that he was an internal medicine specialist, that he practiced in both areas, that he had multiple board certifications, that he handled these types of problems, that he was on staff, that he was leading the infectious disease aspect of the hospital. We believe that the broad scope of cross-examination would allow us to go into it. But I want to put it into context. These two questions that were asked of him took approximately one minute. It was asked of him, didn't you receive a reprimand? And number two, wasn't it for the diagnosis of microhematuria? Those were the two questions. It took very little time. It wasn't argued in closing argument. Then why do it? Pardon? Then why do it? It's not we only brought it up once, we didn't talk about it again. Well, the damage is done or it's not done. Why do it? Because it went to his credibility initially after all of his credentials. The judge said it was nonsensical. Well, she said that there was a basis. She said there was a basis for putting it in because of the misdiagnosis criticism that he had of this doctor. There's no restriction on his practice of medicine. A reprimand doesn't officially restrict you, but it is an official sanction from the Illinois Department of Professional Regulation. In the other cases, there seemed to be restrictions. Like McCrayton, he said the agency could do certain things, unannounced and announced visits. And the physician, a proctor, had to be appointed. O'Brien said the failure to pass an exam, which seems like this one, and his failure to do something doesn't affect his present medical license. No restriction on it. Respectfully, it's in the public record. The Illinois Department of Professional Regulation says gross negligence. This isn't even regular negligence. That could have been brought out, which wasn't. There was a very minor amount of information. It could have been much more extensive. Also, they gave the minimal in Crayton with regard to those proctoring, whatever they could have talked about, the reasons for the proctoring because of problems with female patients, et cetera. They made it less inflammatory, which I think this did. Excuse me. This doctor had no restrictions on his medical practice. He had no restrictions. In the other cases, there seemed to be. Like in Richmond, his license was terminated. At Wiggins, privileges were suspended fully. Suspension and then a monitor. And last one, the staff privileges. I can't read the name of the case. There were four of them that were cited where each of them either involved some privilege or some hospital amount. But here, we're going one step further. You can say a simple reprimand, which doesn't affect your license, we can still cross-examine you on. Well, it can affect other things. Hypothetically, it can affect the types of patients that come to you. Insurance companies won't take reimbursement when some physicians have reprimand. There are many things that that could lead to. But he could still practice in an area. Yeah, you could practice in a more limited fashion. Oh, did the reprimand say that? No, not on that standpoint. But in reality, it can with insurance and types of things like that. In reality, a lot of insurance companies might not like us, period. Well, this is a prevailing problem with sanctions because the only Department of Correctional Regulation can say, no, we don't give any discipline. It can say we only give a letter of concern. They took it to the third step, which was reprimand, which means that they had a finding that there was gross negligence. That's the point of it being not a very, you know, it's not a minor thing in context. But that wasn't used to inflame the jury. Does your firm represent lots of docs? Lots of doctors? Yes. Medical male defense firm? Yes. I think it's a good idea then to let the plaintiff, suppose you flip it around, suppose that Dr. DeFilippo had a letter of reprimand in her file and the evil ambulance chasers on the plaintiff's bar finds this out. They say, we want to put that up in our opening statement. And the first question is, didn't you receive a letter of reprimand for not reading a urinalysis report? I think your firm would be kind of upset about that and say, well, gosh, that's violative of all sorts of rules and cases. And I'm deadly serious about this since I run on this issue a lot. I understand that. Trial lawyers, and I'm sure I was guilty of this as a prosecutor because I was a prosecutor for a very long time. And you often do things because you can. And you try each case on its own. You don't think of what's going to happen the next day. And, frankly, I don't think that's such a bad thing in criminal law. In civil law, though, where you defend doctors and you say it's a great idea, not you personally, but the lawyers who try to say, here's a great idea. Let's attack doctors with letters of reprimand. Let's say I have a physical and we'll win on this case today. And let's forget the fact that two months from now or a year from now, this case could be in front of the appellate court and they'll say, you know what, it's fair game. Anything in the DPRE, if you've got a letter of reprimand, on all sides, any time a doc has one of those, let it in for what it's worth. I think they'll hurt your firm a lot more than they'll hurt the plaintiff's firm, counsel. Just a thought. Am I wrong on that? I do think so with the facts of this case and the way this was led in in a limited fashion. And that was my main point. Excuse me, counsel. Is there anything that the court ruled on to prevent the doctor, plaintiff, from bringing out that the doctor was not limited in his practice? Did the court make a ruling after that saying that they could not say that his practice was not limited in any way, shape, or form? The plaintiffs could have done that freely. And they could have asked. Earlier it was talked about what Judge McCarthy said, listen, you can make your record later. They did not make an offer of proof. She was inviting them to revisit that, to have Dr. Bakken question. It's not that she didn't do a voir dire. The reality of it was they didn't ask for an offer of proof. They didn't have him talk about the background of this or give any more of this. It was those two limited questions and nothing more was done about it. On their standpoint, that's why we say that they have, in effect, prevented the bigger scope of this if the judge were to not bring it in. They didn't use those steps. And they've waived that. And do you distinguish in allowing such a letter of reprimand in on a person who is a retained defense expert as opposed to your defendant doctor? I certainly do because you're hired, your credibility is coming in there. They're wondering, okay, this person must be the greatest person in the world, the way they're presented with their background. This is the expert, and they're called experts. So if you're an expert, you should have a higher standard than a treating physician or a defendant in that case. But do you agree it still should be a limited circumstance where this is allowed? Is that correct? Like this circumstance, I do agree, yes. So only the defense can bring it up. You'd agree with that? I don't agree with that. If my own expert had that. Well, most defense treating physicians are also experts, are they not? Aren't they eventually found to be experts in this field? If they're retained and they testify at such a trial, if they happen to be a defendant, I think the standard wouldn't warrant that high scrutiny. They're putting their credibility out there more so than this hired doctor. And in its totality, that's why I do believe this would have been harmless error if anything. It's such a small part of it. Well, Andrew Elney was called as an expert, was he not? No, he was a treating physician. Just as a treating physician? F-2, yes. Okay. And that's all he testified to as a treating physician. With regard, and I think there were other points made on the second argument, unless there were other questions on the Dr. Bakken issue. The second issue was number four about Dr. MacArthur, the plaintiff's other internal medicine and infectious disease expert. He testified that these nurses could have earlier, when the hospital was in the case, the nurses could have given this unison nine hours earlier when ordered and two doses that were skipped and that would have confined the infections to the abdomen. Now, it's important because this was approximate cause cross-examination of Dr. MacArthur and Judge MacArthur found that as such because he also said that no matter what Dr. DiFilippo would have done, what she would have prescribed, it would have been confined to the abdomen still. It would have only spread to the abdomen. So we are talking beyond that. So that's why there could be a sole proximate cause defense saying that, okay, when these other persons were in there and Expert MacArthur was talking against them, he was playing both sides, and he said, oh, if these drugs would have been given, it would have just stayed in the abdomen. But he also said earlier in his testimony about Dr. DiFilippo that that's where it would have gone anyway, no matter what she did. So there was a sole proximate cause argument, and that's why it was let in. The third point, unless there were others. Page 37 of the White Brief, though, the question was asked by the judge, the trial counsel, the defense counsel. Are you suggesting you have a proximate cause expert who's going to come in here and say that someone else was at fault here, defense counsel? No. All right. Would that lead anybody who heard that believe that you're not arguing it's going to be a sole proximate cause? You don't have somebody to say it's a sole proximate cause? Somebody other than DiFilippo. All right. At that point, he was talking about the standard of care, I believe, with Dr. MacArthur. Is this of a? It's of MacArthur. While MacArthur is on the stand. Our brief? Their brief, page 37. The question is, representation is made by your counsel when this is happening, when they're trying to get into the cross of, no, we're not going to try to, we're not calling anybody as an expert to say sole proximate cause should be blamed on the nurses. And so the judge will outlet it in, as they often do, for what it's worth, and sure enough, at the end of the trial, oh, yeah, I'm going to instruct on sole proximate cause that it's the nurses' fault. Well, we're not saying that they violated the standard of care. We're saying that that could have caused the injury, which was a distinction. Well, you're saying whoever said that was saying that we don't have any experts to say that the sole proximate cause, in this case, right? Right. Okay. And later on, you argued sole proximate cause. But Judge MacArthur was adopted by us. His opinions were adopted, and we could use him. And I don't know if that was meant other than this witness here. We weren't going to have another independent witness say that. It's all in English, and I agree with you. But move on. Okay. The third issue was one regarding Dr. Andreone and the insurance issue. There was the judge invited the plaintiff's attorney multiple times to do something to, if they wanted to have an examination of this attorney to do a petition for rule to show cause. They didn't do that until right before the closing argument, and they didn't serve it upon that attorney. So there was a Well, this is an eight-day case, and Dr. Andreone was kind enough to come in to counsel, to take it at depth on a Saturday, wonderful fellow. And so it didn't come up until the middle of trial, right? It was during the So they couldn't have asked for rule to show cause against the lawyer who stepped in to help Dr. Andreone until the end of trial, right? No, there were several days between that and How many days? My recollection is three days. Okay. They had three whole days to do that. And they brought it up, though, to the judge the very next This was on a weekend that Dr. Andreone brought it up on Monday, and she said, well, go through the proper procedures. And they didn't do that until right before closing argument. And that point was too long. Well, generally, I don't encourage people to file rule to show cause against fellow attorneys, but that's just like I don't If I were to ever represent doctors, I wouldn't suggest lending in letters of reprimand of doctors to try and take that long view. But apparently other lawyers don't have that. Anything else? Finally, with regard to the insurance issue, I think there was no connection shown at all that Dr. Andreone was an agent of the insurance company or anything like that. One point I didn't mention was the motions in Limine that were brought up initially about the Dr. Bakken issue. It was only about litigation. It wasn't about disciplinary actions or anything. There was no motion in Limine that was violated. At what point were they told, plaintiff's lawyers told, that your guys, your team, had Dr. Bakken's disciplinary record and intended to use it? They knew it all along at the deposition that Dr. Bakken gave many months before. Very good. And they didn't move a motion in Limine to fire. We did to make sure the court understood the issues and then do it in a limited fashion within the small part of this, which we would believe, if anything, would be harmless error. Okay. Those are, unless there's other questions, I don't believe I have other points to make. Thank you. Thank you, Your Honor. I will be very brief. On the Bakken issue, this doctor went 30 years without a disciplinary action against him. And this has a point. He settled a case because he did not learn. Is this in the record? It was in his deposition. And defense counsel mentioned to the court that he settled a case and that's how the disciplinary action came into being. Did he argue to the judge to be allowed to make this presentation to the jury? Defense counsel never argued that he wanted to bring up the settled case. No, counsel, was it argued by the plaintiff to bring up this information? That we wanted to bring it up? I'm sorry. Yeah, did you want to bring it up and tell the jury about the 30 years of? No, no. We wanted to keep this out. We're in the impossible position, once the reprimand comes in, to have to go through all these steps to explain it. Yes, I did make a mistake. Yes, I did the right thing and I wanted to settle this case. Yes, because I settled this case, there is now an automatic review by the IDPH. And yes, I was surprised that I got a disciplinary mark on my record because of this, but I thought I was doing the right thing. Now, that's a two-edged sword and that's what we were confronted with and what do we do with this now? How do we explain it? We have to drag in the underlying issues. And this is going to have, if this allows to stand, it's going to have a chilling effect on settlements because any time a doctor agrees to settle a case, it's going to trigger an automatic review now. Well, we have no control over what the DPRE does or whoever it is that had the letter of reprimand. I mean, none. We have no impact on those people at all. Well, the bottom line is it just had no relevance to the issues in this case and it was just thrown out like negligence in the air or like in the bad old days throwing out old criminal convictions that aren't supposed to be used to prove the person's guilty, but to tell a jury that. And that's what happened, why we were so prejudiced. All they knew was no other doctor in defense counsel used this offensively, asked each of his experts, Dr. Sabia, Dr. Flaherty, your license has never. . . On Andreone, Your Honors, the judge never suggested that we file a petition for rule to show cause. We were just told do what you think you have to do, but I'm not changing my rulings, which made it a futile effort. So there cannot be waiver. We did file a petition for rule to show cause against the lawyer as a last resort. Nobody wants to do these things. The judge struck it from the record and said we're going to do this after trial. So we had no opportunity to really go into this case. If Your Honors have no other questions. Thank you. Thank you very much. We will take the case on advisement.